NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LEHMAN COMMERCIAL PAPER, INC., : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> ZUHDI KARAGJOZI, : <br> : <br> Defendant. : | Civ. No. 07-4425 (GEB) <br><br> **MEMORANDUM OPINION** |

**BROWN, Chief Judge**

      This matter comes before the Court upon motion by Lehman Commercial Paper, Inc. ("Plaintiff") for summary judgment [Docket No. 16]. The Court, having considered the parties' submissions and having decided the motions without oral argument pursuant to Federal Rule of Civil Procedure 78, and for the reasons discussed below, will grant Plaintiff's motion.

**I.    BACKGROUND**

      **A.    The Financial Transactions**

      Zuhdi Karagjozi ("Defendant"), was the founder, director and sole shareholder of Kara Homes, Inc. ("Kara"). (Compl., ¶ 3; Pl.'s Mot., ¶ 1.) Defendant and Kara were also the only members of Kara at Glen Eyre, LLC ("Glen Eyre"). (Compl., ¶ 3; Pl.'s Mot., ¶ 1.) Both Kara and Glen Eyre were engaged in the acquisition, development and construction of residential real estate projects in Atlantic City, New Jersey. (Pl.'s Mot., ¶ 1 (citing Def.'s Answer, ¶ 3.))

      In mid October 2005 and early January 2006, Glen Eyre engaged in three separate transactions with National City Bank ("NCB"), whereby NCB agreed to provide financing for the purchase, site development and construction costs associated with the development of two real estate projects. (Compl., ¶¶ 6, 7 13, 14, 20, 21.) With respect to the first project, a thirty-seven home subdivision called Kara at Glen Eyre, Phase I ("Phase I Project"), Glen Eyre executed

several documents on October 13, 2005, thereby securing a loan from NCB for up to $8,233,822. *Id.* at ¶ 6, 7; Pl.'s Mot., ¶ 2, 3   These documents included a Construction Loan and Security Agreement as well as a Note evidencing Glen Eyre's obligation to repay NCB for any funds provided pursuant to the Construction Loan and Security Agreement. *Id.*; Const. Loan and Sec. Agmt dated Oct. 13, 2005, attached as Exh. G to Decl. of Michael E. Brown, Esq. ("Brown Decl."); Note dated Oct. 13, 2005, attached as Exh. H to Brown Decl.  In addition to these documents executed by Glen Eyre, Defendant executed and delivered to NCB an Unconditional and Continuing Guaranty ("Phase I Guaranty"), through which Defendant personally guaranteed the prompt repayment of any indebtedness due and owing to NCB under the Note. *Id.* at ¶ 4; Phase I Guar., Section 1(a), attached as Exh. I to Brown Decl.  Pursuant to these documents, NCB loaned Glen Eyre $5,285,268 for the Phase I Project.  (Pl.'s Mot., ¶ 5; Aff. of Daniel B. Kamensky, ¶ 5 ("Kamensky Aff."))

On or about January 10, 2006, Glen Eyre executed and delivered to NCB another set of loan documents for the financing of a second real estate project, a one hundred and twenty-five home subdivision called Kara at Glen Eyre, Phase II ("Phase II Project"). (Compl., ¶¶ 13, 14; Pl.'s Mot., ¶¶ 6, 7.)  These documents again included a Construction Loan and Security Agreement as well as a Note and provided that NCB would loan Glen Eyre up to $19,780,000 for the Phase II Project. *Id.*; Const. Loan and Sec. Agmt dated Jan.10, 2006, attached as Exh. J to Brown Decl.; Note dated Jan. 10, 2006, attached as Exh. K to Brown Decl.)  Further, Defendant again executed and delivered to NCB an Unconditional and Continuing Guaranty ("Phase II Guaranty"), thereby personally guarantying Glen Eyre's indebtedness to NCB under this Note as well.  (Pl.'s Mot., ¶ 8; Phase II Guar., Section 1(a) attached as Exh. L to Brown Decl.)  Pursuant to these documents, NCB loaned Glen Eyre $8,072,008.42 for the Phase II Project. (Pl.'s Mot., ¶ 9, Kamensky Aff., ¶ 9.)

Glen Eyre also executed another set of documents on or about January 10, 2006, through which NCB agreed to provide mezzanine financing of up to $2,393,950 for the Phase II Project.

(Compl., ¶¶ 20.21; Pl.'s Mot., ¶¶ 10, 11.)  Again, these documents included a Mezzanine Loan Agreement as well as a Note. (*Id.*; Mezz. Loan Agmt, attached as Exh. M to Brown Decl.; Mezz. Note, attached as Exh. N to Brown Decl.)  Defendant and Kara also executed and delivered to NCB another Unconditional and Continuing Guaranty ("Mezzanine Guaranty" and together, with the Phase I Guaranty and the Phase II Guaranty, the "Gurantees"), thus Defendant also personally guaranteed Glen Eyre's indebtedness to NCB under this Note as well.  (Pl.'s Mot., ¶ 12; Mezz. Guar., Sections 2, 3, attached as Exh. O to Brown Decl.)  Pursuant to terms of these documents, NCB loaned Glen Eyre $2,054,301.09 for the Phase II Project.  (Pl.'s Mot., ¶ 13; Kamensky Aff., ¶ 13.)

On or about January 26, 2007, Lehman acquired the rights and interests of NCB under these three sets of loan documents and as such is the successor-in-interest to NCB in these transactions. (Pl.'s Mot., ¶ 15; Kamensky Aff., ¶ 15.)

**B.    The Kara and Glen Eyre Bankruptcies**

On or about October 10, 2006, Kara and Glen Eyre (together, "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code. (Pl's Mot., ¶ 16; Def.'s SL. Civ. R. 56.1 Statement of Material Facts, ¶ 6.)  On or about June 28, 2007, Debtors filed their First Amended Master Plan of Reorganization ("First Amended Plan"). (Pl.'s Mot., ¶ 17; First Amended Plan, attached as Exh. Q to Brown Decl.)  Section 10.06 of the First Amended Plan provides that "each Non-Debtor Releasing Party . . . shall be deemed to have . . . forever released and discharged" the Debtors as well as other parties "from any and all claims, obligations, rights, Causes of Action or liabilities . . . ." (Pl.'s Mot., ¶ 19 (quoting First Amended Plan, Section 10.06.))

On or about August 30, 2007, the First Amended Plan was modified by the Second Modification to the First Amended Plan of Reorganization ("Second Modification" and together, with the First Amended Plan, the "Plan"). (Pl.'s Mot., ¶18; Second Modif., attached as Exh. R to Brown Certif.)  Among its other provisions, the Second Modification provides that "[t]he Plan is

3

modified to clarify that Lehman Commercial Paper is specifically excluded from the definition of a 'non-debtor releasing party' as such term is used in the Plan." (Pl.'s Mot., ¶ 20 (quoting Second Modif., ¶ 4(f)).)

On or about September 4, 2007, Defendant filed an objection to the Plan ("Objection"). (Pl.'s Mot., ¶ 21; Obj., attached as Exh. S. to Brown Decl.)  Among other arguments, Defendant asserted that "[t]he Plan improperly provides releases to the debtors' professionals." (Obj., ¶¶ 6-7.)  Specifically, Defendant argued that Perry Mandrino, whom Defendant stated is the "debtors' chief restructuring officer," and Mr. Mandrino's "associates," a term which is not defined in the Objection, "inserted into the plan provisions providing absolute releases to them and their professionals for all of their conduct" and that such releases "are beyond the jurisdiction of this Court to award; . . . are without consideration; and . . . are totally unjustified." *Id.* at ¶¶ 1, 6.  Defendant also noted that Mr. Mandrino and his "associates" "bargained away their releases when they felt they had to" and that, as a result of such bargaining, "Lehman Commercial Paper, Inc. is not bound by the releases." *Id.* at ¶ 7.

On September 12, 2007, the United States Bankruptcy Court for the District of New Jersey entered an order confirming the Plan ("Confirmation Order").  (Pl.'s Mot., ¶ 22; Confirm. Or., attached as Exh. T to Brown Decl.)  In the Confirmation Order, the Bankruptcy Court overruled several objections to the Plan, including Defendant's Objection, specifically stating "[e]xcept as otherwise provided in this Order . . . all objections (including, without limitation, the objection of Zuhdi Karagjozi) are deemed overruled."  (Conf. Or., Section H.)

### C. Sales of Phase I Project and Phase II Project

On July 2, 2007, the Bankruptcy Court entered an order permitting the sale of the Phase I Project ("Phase I Sale Order").  (Pl.'s Mot., ¶ 24; Phase I Sale Or., attached as Exh. U to Brown Decl.)  According to the Phase I Sale Order, the Phase I Project was to be sold to Enclave at Glen Eyre LLC no later than July 13, 2007 and Plaintiff would receive $5,244,000 at closing.  (Phase I Sale Or., 2, ¶ H.)  Although no documentation has been submitted regarding when the sale of the

4

Phase I Project was actually consummated, Plaintiff states that, as a result of the sale, it received $5,211,453.54. (Kamensky Aff., ¶ 26.)

On August 23, 2007, the Bankruptcy Court entered an order authorizing the sale of the Phase II Project to Plaintiff via a credit bid of a portion of its secured debt based on the amounts due and owing from the Debtors to Plaintiff ("Phase II Sale Order"). (Pl.'s Mot., ¶ 27, Phase II Sale Or., attached as Exh. V to Brown Decl.) Then, on or about May 12, 2008, Plaintiff entered into an agreement to sell the Phase II Project to the Engel Group, LLC. (Certification of Sam Engel ("Engel Certif."), ¶ 2.) Although it appears that the sale of the Phase II Project to the Engel Group had not been consummated by the time Plaintiff filed its motion, Plaintiff states that it expects to receive a total of $6.25 million upon closing of the transaction. (Kamensky Aff., ¶ 30.)

### D. Procedural History

On September 17, 2007, Plaintiff filed a complaint against Defendant for amounts it asserted were due and owing pursuant to the Guarantees as well as for attorneys fees, costs of suit and interest and expenses related to the litigation. [Docket No 1]. Defendant filed his Answer on November 15, 2007. [Docket No. 2]. Upon the close of discovery, Plaintiff filed the instant motion for summary judgment on July 7, 2008. [Docket No. 16]. In its motion, Plaintiff asserts that as of July 1, 2008, Defendant owes Plaintiff $8,154,724.73, which includes interest, charges, fees and expenses to which Plaintiff asserts it is entitled under the Guarantees. (Pl.'s Mot., ¶ 35.) Plaintiff further requests that the Court order a proof hearing to determine damages due and owing to Plaintiff under the Guarantees, which it states should include "any unpaid interest, attorney's fees, costs of suit." (Pl.'s Mot., 2.)[1]

---

[1] Subsequent to the filing of his opposition and of Plaintiff's reply, Defendant submitted to the Court the Certification of Michael Molotschko ("Molotshcko Certfication") on September 17, 2008 and asked the Court to permit its filing. [Docket No. 17]. The Court granted Defendant's request, and also permitted Plaintiff to file a response to the Molotschko Certification, which it did on September 22, 2008. [Docket Nos. 23, 24]. The motion is now fully brief and ready for decision.

## II. DISCUSSION

### A. Standard of Review

Summary judgment may be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Issues of material fact are genuine only if the evidence presented could allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the nonmoving party. *See Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987). However, the nonmoving party "cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact" sufficient to defeat summary judgment. *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 511 (3d Cir. 1994); see also Fed. R. Civ. P. 56(e) (nonmoving party's response must contain specific facts showing that there is a genuine issue for trial.)

### B. Defendant Has Failed to Assert Genuine Issues of Material Fact Sufficient to Survive Summary Judgment

Defendant argues in opposition to Plaintiff's motion that he and Plaintiff orally agreed that Plaintiff would relieve him of his debt under the Guarantees if Defendant procured a purchaser for the Phase I Project. (Def.'s Resp., 4.) Defendant further avers that he procured a buyer for the Phase I Project and that when he did so, Plaintiff again orally transmitted to him that a release would be forthcoming. *Id.* Plaintiff also alleges that he produced a buyer for the Phase II Project. *Id.*

In support of his argument, Defendant has submitted three certifications. The first is one made by the Defendant himself ("Karagjozi Certification"), in which Defendant states that "Lehman . . . transmitted an offer to me that they would release my personal guaranty of their paper if I sell [the Phase I Project]." (Karagjozi Certif., ¶ 5). Defendant further states that, upon his procurement of a purchaser for the Phase I Project, "my representatives told me that Lehman

was ecstatic" and that he "was again told that I would be getting a release." *Id.* at ¶ 6. Defendant also states that he procured an ultimate buyer for the Phase II Project and that he found buyers for both of these projects "based upon the representation to [Defendant] by Lehman that [he] would receive a release on my personal guaranty" for doing so. *Id.* at ¶ 8.

In further support of his argument, Defendant also submitted the Certification of John Figurelli ("Figurelli Certification"), in which Mr. Figurelli states that in June 2007 he was serving as the Director of Finance of Kara and attended a Board of Directors meeting, presumably of Kara, "at which Karagjozi and his attorney raised the issue of guaranty releases regarding [the Phase I and Phase II Projects]." (Figurelli Certif., ¶ 2, 3.) Mr. Figurelli further states that "[b]ecause of a prior agreement with Lehman, Zuhdi stated that he would object to the sale without his releases" and that "Karagjozi was told by either David Bruck or Perry Mandrino, the [Debtors'] estate attorney and the [Debtors'] chief restructuring officer respectively, that he would be getting the releases." *Id.* at ¶ 3.

Finally, Defendant submitted the Molotschko Certification, in which Mr. Molotschko states that he was present during a conference call between Sam Engel, the manager and chief financial officer of the Engel Group, LLC, and Daniel Kamensky of Lehman Brothers. (Molotschko Certif., ¶ 2; Engel Certif., ¶ 1.)[2] In the Molotschko Certification, Mr. Molotschko states that "[d]uring the course of this meeting, [Kamensky] stated that as a part of the sale of [the Phase II Project] to Engel, [Defendant] would be released from his personal liability for the debt [he owed pursuant to the Guarantees]." (Molotschko Certif., ¶ 2.)

Viewing these facts in a light most favorable to Defendant, Defendant nevertheless fails to put forth sufficient evidence to withstand summary judgment. *Hancock Indus.*, 811 F.2d at 231. In his own certification, Defendant broadly asserts that Plaintiff "transmitted an offer to me that they would release my personal guaranty of their paper if I sell [the Phase I Project]."

---

[2]Although the Molotschko Certification references a "Daniel Kominsky," it appears that it is actually referring to Daniel B. Kamensky, who is an authorized signatory of Plaintiff and who submitted an affidavit in support of Plaintiff's motion. *See* Kamensky Aff., ¶ 1.

(Karagjozi Certif., ¶ 5.) He fails to state the circumstances of this agreement with any level of specificity, staying silent as to how, when and by whom the oral agreement was transmitted to him. Further, the Figurelli Certification does not set forth any facts regarding how or when this oral agreement was made, but instead indicates that the Debtors' attorney or chief restructuring officer, neither of whom have the authority to enter into an agreement on behalf of Plaintiff, stated that Defendant would be released from his obligations under the Guarantees in light of some "prior agreement with Lehman." (Figurelli Certif., ¶ 3.) The Molotschko Certification is similarly unhelpful to Defendant. In it, Mr. Molotschko states that he heard Mr. Kamensky indicate to Mr. Engel that, as a part of the sale of the *Phase II* Project, Defendant would be released from his obligation under the Guarantees. (Molotschko Certif., ¶ 2.) This statement does not comport with Defendant's contention that Plaintiff orally agreed to release his debt in exchange for the procurement of a buyer for the *Phase I* Project. *See* Karagjozi Certif., ¶ 5. In addition to this discrepancy, the Molotschko Certification does not set forth any evidence that an oral agreement was transmitted to Defendant with respect to the sale of either the Phase I or Phase II Projects. Instead, Mr. Molotschko asserts that he heard Mr. Kamensky state to *Mr. Engel*, not Defendant, that Plaintiff would release Defendant's of his debt in exchange for his procurement of a buyer for the Phase II Project. (Molotschko Certif., ¶ 2.) As such, Defendant has failed put forth sufficient evidence that would allow a reasonable jury to find in his favor that a subsequent oral agreement between him and Plaintiff released him of his debt under the Guarantees. *Anderso*n, 477 U.S. at 248.

In light of the foregoing, Plaintiff's motion for summary judgment on this ground is granted. Plaintiff shall within 20 days from the date of this Memorandum Opinion and accompanying Order contact the Court to schedule a proof hearing to determine damages due and owing to Plaintiff under the Guarantees.

 C. **Plaintiff's Request for Attorneys Fees and Costs Under the Guarantees**

Plaintiff also asserts that it is entitled to attorneys fees and costs incurred through seeking

enforcement of Defendant's obligations under the Guarantees. (Pl.'s Mot., 20.) Both the Phase I Guaranty and Phase II Guaranty include the following provision:

> In addition to the obligations set forth in Section 1(a) above, the Guarantor will pay to the Bank, upon demand, and the Bank shall have recourse against any and all of the Guarantor's assets for payment of, all costs and expenses, including without limitation reasonable counsel fees, which may be incurred by the Bank in the collection or enforcement of the Guarantor's obligations under this Guaranty.

Phase I Guar., Section 1(c); Phase II Guar., Section 1(c).

The Mezzanine Guaranty contains similar language with respect to the recoupment of attorneys fees and costs associated with enforcement of the agreement:

> Each of the Guarantors agrees to pay, or to reimburse the Bank for, any and all out-of-pocket expenses reasonably incurred by the Bank (including, without limitation, reasonable attorneys' fees and costs) in connection with the enforcement of the Bank's rights under this Guaranty.

Mezz. Guar., Section 11(d).

### 1. Choice of Law

The Phase I and Phase II Guarantees each include a provision stating that they are to be governed by the substantive laws of the State of New Jersey, while the Mezzanine Guaranty provides that it is to be governed by the laws of the State of Ohio. *See* Phase I Guar., Section 5(e); Phase II Guar., Section 5(e); Mezz. Guar., Section 11(g). The laws of these two states regarding the enforceability of fee shifting provisions in commercial agreements conflict with one another, with New Jersey law upholding such provisions and Ohio law rejecting these clauses. *See Glenfed Fin. Corp., Commercial Fin. Div. v. Penwick Corp.*, 647 A.2d 852 (N.J. Super. Ct. App. Div. 1994), *cert. denied*, 655 A.2d 444 (N.J. 1994) (upholding loan agreement provision requiring debtor to reimburse creditor for costs and attorneys fees incurred as a result of collection of the debt); *Buckeye Federal Sav. & Loan Ass'n v. Guirlinger*, No. 90AP-271, 1991 Ohio App. LEXIS 154, *7-8 (Ohio Ct. App. Jan. 15, 1991) (reversing lower court's award of attorneys fees pursuant to guaranty provisions requiring such reimbursement and holding that

such provisions are against public policy). As such, the issue of which state's law should be applied to the Mezzanine Guaranty's attorneys fees provision is outcome determinative.

A court exercising diversity jurisdiction must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy." *N. Bergen Rex Transp. v. Trailer Leasing Co.*, 730 A.2d 843, 847 (N.J. 1999) (quoting *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 614 A.2d 124 (N.J. 1992) (internal quotations omitted)). However, New Jersey law will govern if:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.

*N. Bergen Rex Transp.*, 730 A.2d at 847-48 (quoting *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 614 A.2d 124 (N.J. 1992); Restatement (Second) of Conflicts of Laws § 187 (1969) (Restatement)).

In the instant case, Plaintiff is a corporation organized and existing under the laws of the State of New York and Defendant is a citizen and resident of the State of New Jersey. (Compl. ¶¶ 1, 2; Def.'s Ans., ¶ 2.) Further, both the Phase I and Phase II Projects are located in New Jersey and nothing in the record indicates that either party has any connection to the State of Ohio. *See* Compl., ¶ 1. It appears that the only reason that the Mezzanine Guaranty provides that the agreement is governed by the laws of the State of Ohio is because the agreement was entered into by a division of NCB (Plaintiff's predecessor in interest under the agreement) that is located in Ohio. *See* Mezz. Guar., 1, Sec. 11(i). As such, there appears to be no relationship, substantial or otherwise, between Ohio and either party nor the transaction and there is no other reasonable

basis for the parties' to choose to apply the law of the State of Ohio. *N. Bergen Rex Transp.*, 730 A.2d at 847-48 (citations omitted). In light of this fact as well as the case's connections to the State of New Jersey as noted above, the Court will apply New Jersey law in determining the validity of the provisions in all three Guarantees under New Jersey law.

### 2. Plaintiff is Entitled to Attorneys Fees and Costs Under the Guarantees

New Jersey law permits parties to a contract to shift liability for attorneys' fees. *Dare v. Freefall Adventures*, 793 A.2d 125, 135 (N.J. Super. Ct. App. Div. 2002 (citing *Cohen v. Fair Lawn Dairies, Inc.*, 206 A.2d 585 (N.J. Super Ct. App. Div. 1965), *certif. granted*, 209 A.2d 145, *aff'd*, 210 A.2d 73 (N.J. 1965). "However, even where attorney-fee shifting is controlled by contractual provisions, courts will strictly construe that provision in light of the general policy disfavoring the award of attorneys' fees." *Id.* (quoting *N. Bergen Rex Transp., Inc.*, 730 A.2d at 848).

Under New Jersey law, the shifting of attorneys fees is permissible in the commercial loan context. In *Glenfed Financial Corp.,* the court upheld the validity of a provision of a loan agreement that obligated the defendant debtor to reimburse the creditor plaintiff "for all costs of collection incurred . . . after the occurrence of any event of default . . . including outside attorneys' fees," noting that New Jersey "courts recognize the enforceability of such contractual agreements for the payment of attorneys' fees incurred in a collection action." *Id*. at 861 (citing *Alcoa Edgewater No. 1 Fed. Credit Union v. Carroll*, 210 A.2d 68 (N.J. 1965)). As such, the provisions of the Guarantees requiring Defendant to reimburse Plaintiff for attorneys fees and costs are enforceable under New Jersey law. In light of the foregoing, Plaintiff's motion for summary judgment on this ground is granted. Plaintiff shall within 20 days from the date of this Memorandum Opinion and accompanying Order submit to the Court evidence of the fees and expenses incurred in connection with this matter.

### II.   CONCLUSION

For these reasons, Plaintiff's motion for summary judgment [Docket No. 16]. is granted.

An appropriate form of order is filed herewith.

Dated:  December 30, 2008



                                                            /s/ Garrett E. Brown
                                      GARRETT E. BROWN, JR., U.S.D.J.